**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CANDICE ROSSI CHEOLAS and
STEVE CHEOLAS,

      Plaintiffs,                         Case No. 06-11885

v.                                     Hon. Gerald E. Rosen

CITY OF HARPER WOODS, *et al.,*

      Defendants.
_____/

**OPINION AND ORDER REGARDING DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT ON FEDERAL CLAIMS**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____September 29, 2009_____

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiffs Candice Rossi Cheolas and Steve Cheolas commenced this case in this

Court on April 21, 2006, asserting a variety of federal and state-law claims against the

Defendant City of Harper Woods and a number of its employees and agents.  Plaintiffs'

claims arise principally from the events surrounding an April 24, 2004 party at their home

to celebrate their daughter's 15th birthday, a party that came to a quick and controversial

end when the Harper Woods police entered the home in response to a 911 call from a

parent of one of the children attending the party and discovered evidence of widespread

underage drinking.  Following this incident, Plaintiffs were charged with misdemeanor violations of Harper Woods ordinances and state law, but the charges against Steve Cheolas were dismissed and Candice Rossi Cheolas was acquitted of all charges.  Despite these acquittals, Mrs. Cheolas was terminated from her job with the City of Harper Woods.  Most of Plaintiffs' claims in this case arise from the initial police entry into their home and their subsequent criminal prosecution, and the remaining claims are based upon the termination of Mrs. Cheolas's employment with the Defendant City.

A number of summary judgment and related motions are presently pending before the Court.[1]  The present opinion addresses two of these motions:  (i) a motion brought by the Defendant City of Harper Woods police officers, detectives, emergency medical services ("EMS") paramedics, and city manager, seeking summary judgment in their favor on Plaintiffs' federal 42 U.S.C. § 1983 and state-law tort claims directed against these Defendants, and (ii) a motion brought by the Defendant City of Harper Woods, its police department, and its city manager, seeking summary judgment in their favor on Plaintiff's § 1983 claims, federal claims of gender and age discrimination, and state-law tort and employment-related claims directed against these Defendants.[2]

---

[1]Previously, by opinion dated February 13, 2009, the Court granted a motion for summary judgment filed by two of the Defendants, attorneys Russell LaBarge and Sharon DeWaele, finding that the claims against these Defendants were barred by prosecutorial immunity.

[2]In response to this latter motion, Plaintiffs concede that the Harper Woods police department is not subject to liability in this case, and that the Defendant City likewise is not subject to liability under Plaintiff's state-law tort-based theories of recovery.

Each of these motions has been fully briefed by the parties.[3]  Having reviewed the parties' briefs in support of and opposition to Defendants' motions, as well as the accompanying exhibits and the remainder of the voluminous record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motions "on the briefs."  *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on these two motions.

## II.  **FACTUAL BACKGROUND**

As noted in the Court's prior opinion, the complaint in this case spans 67 pages, includes 310 numbered paragraphs, and asserts 22 separate claims.  For present purposes, the Court offers a somewhat abbreviated summary of these allegations and the resultant voluminous record compiled both prior to and during the lengthy discovery period, with more detail to follow as pertinent to the specific issues addressed in this opinion.

### A.     **The Parties**

Plaintiffs Candice Rossi Cheolas and Steve Cheolas are residents of the Defendant City of Harper Woods.  On April 24, 2004, they hosted a surprise party in the basement of

---

[3]Apart from responding to these two summary judgment motions, Plaintiffs have separately moved for a continuance under Fed. R. Civ. P. 56(f), complaining that they were unable to take the depositions of four of the named Defendants — including Defendants LaBarge and DeWaele, whose summary judgment motion the Court has now granted, as well as city manager James Leidlein and detective David Sheill — before the due dates of their responses to Defendants' summary judgment motions.  The Court addresses this matter below.

their home to celebrate the 15th birthday of their daughter, Alexandra.  At the time of this party, Mrs. Cheolas was employed by the Defendant City as the director of parks and recreation, the community center, and public relations, and she had worked for the City since 1969.

Apart from the City of Harper Woods and its police department,[4] Plaintiffs have named 14 individuals as Defendants in this case.  Defendants David Emmendorfer, Thomas Teatsorth, Gerald Firlik, and Thomas Silva (referred to collectively as the "Police Defendants") are Harper Woods police officers who responded to the 911 call on the night of the party at Plaintiffs' home.  Defendants Merico Foleta, Patrick Rollison, and Kenneth Kogelmann (referred to collectively as the "EMS Defendants") are Harper Woods firefighters/paramedics who also responded to this call.  Defendants William Snider and David Sheill are Harper Woods police detectives who conducted a further investigation in the aftermath of the party.  Defendant James E. Leidlein is the Harper Woods city manager, and he made the decision to terminate Mrs. Cheolas's employment with the City.  Defendants Russell LaBarge served at the time as the city attorney for Harper Woods and prosecuted the criminal charges brought against Plaintiffs, and he was assisted in this effort by Defendant Sharon DeWaele.[5]  Finally, Defendant Lawrence VanOverbeke is the parent who placed the 911 call on the night of the party, reporting

---

[4]As noted earlier, Plaintiffs concede that there is no basis for a recovery against the police department in this case.

[5]As noted earlier, the Court has granted a motion for summary judgment brought by these two Defendant attorneys.

4

that his daughter, Phelicia, was in need of emergency assistance at Plaintiffs' home, and

his wife, Defendant Kelli VanOverbeke, was attending to Phelicia inside the residence at

the time of her husband's 911 call.

**B.    The April 24, 2004 Party at Plaintiffs' Home**

As stated at the outset, the claims in this case arise from the events surrounding a

Saturday, April 24, 2004 party at Plaintiffs' Harper Woods home to celebrate the 15th

birthday of their daughter, Alexandra.  The guests at the party were high school freshmen,

who had been advised by Plaintiffs that alcohol would not be permitted on the premises.

While Plaintiffs' 18-year-old son, Nicholas, took his sister Alexandra out to dinner, the

guests began to arrive at Plaintiffs' home between 7:15 and 8:00 p.m., planning to

surprise Alexandra upon her return home.  The teenaged guests were greeted at the door

by one or both Plaintiffs and sent downstairs to the basement, with roughly 30 to 35

children in attendance by the time the party began.  Plaintiffs have testified that they did

not observe these teenagers bringing any containers with them into the home.

Unbeknownst to them, however, some of the guests had concealed containers of high-

proof alcohol in their clothes as they arrived at the party.

At around 8:30 p.m., Plaintiffs' son Nicholas and daughter Alexandra arrived

home from dinner.  Alexandra was taken down to the basement where she was surprised

by her family and friends.  Just after 9:00 p.m., a parent of one of the teenagers in

attendance, Mary Jo Pickelhaupt, arrived at Plaintiffs' home with pizza for the party, and

she and Mrs. Cheolas brought the food down to the basement, spending about five

minutes arranging the food and talking to the children.  Neither Mrs. Pickelhaupt nor Mrs.

Cheolas noticed anything out of the ordinary.  In addition to this trip to the basement to

deliver food, Mrs. Cheolas testified that she went downstairs "sporadically" during the

party "[j]ust to check on things," and that she "saw no signs of alcohol being served" or

"of any child drinking."  (Police Defendants' Motion, Ex. 11, C. Cheolas Dep. at 154.)

Among the guests at the party was 14-year-old Phelicia VanOverbeke, the

daughter of Defendants Lawrence and Kelli VanOverbeke.  At around 10:00 p.m., Mrs.

VanOverbeke telephoned Plaintiffs' residence and asked to speak to her daughter, and

Mrs. Cheolas called down the stairs for Phelicia to pick up the phone.  After a short time,

Mrs. Cheolas got back on the line and, upon learning that Phelicia had not yet responded,

promised Mrs. VanOverbeke that she would find her daughter and have her call her

mother.  When she located Phelicia in the basement, however, Mrs. Cheolas discovered

that the girl's speech was slurred and that she had evidently been drinking.  Mrs. Cheolas

helped Phelicia up the stairs, with the assistance of a boy at the party, and took her to the

bathroom.  While the girl was in the bathroom, Mrs. Cheolas asked her son Nicholas to

go downstairs "to see what was going on," and he reported back that the teenagers denied

that anyone was drinking, and that Phelicia had arrived at the party in an intoxicated state.

(*Id.* at 167-68.)  Mrs. Cheolas then led Phelicia to a couch in the den, informing her that

she planned to call her mother.

Before she could do so, however, Mrs. VanOverbeke arrived at Plaintiffs' home to

check on her daughter.  According to Mrs. Cheolas, when Mrs. VanOverbeke entered the

home and saw her daughter, she asked "who did this to you?" and "[w]ho pierced your ears?" (*Id.* at 175.) Mrs. Cheolas responded that Phelicia "has been drinking" and "did this to herself." (*Id.* at 177.) She further testified that Phelicia's condition "deteriorated somewhat" and that "[s]he appeared to get drunker when her mom arrived," with the girl "slumping somewhat" and speaking less clearly than she had earlier. (*Id.* at 177-79.) Mrs. VanOverbeke then stated that she was calling the police, but Mrs. Cheolas asked her not to, explaining that she "didn't think there was any need for them to be in the house." (*Id.* at 185-86.) Despite this request, Mrs. VanOverbeke left the house to speak to her husband, who was waiting outside, and instructed him to call the police. She then returned to the house to attend to her daughter.

At around 10:18 p.m., Mr. VanOverbeke placed a 911 call to the Harper Woods emergency dispatch. According to a transcript of this call, Mr. VanOverbeke stated that there was an "emergency" at Plaintiffs' home, and that there was "a party here" at which "somebody has . . . given . . . my daughter some drugs." (Police Defendants' Motion, Ex. 1, 911 Call Transcript.) Mr. VanOverbeke further stated that "we don't know what happened here but we need somebody to come here to see our daughter." (*Id.*) The dispatcher asked "do you want EMS" and Mr. VanOverbeke responded that "[t]hat would be fine," but he also requested that the police be sent to the residence. (*Id.*)

Four Harper Woods police officers responded to this call: Defendant police officers David Emmendorfer and Thomas Silva, Defendant police sergeant Gerald Firlik, and Defendant police detective Thomas Teatsorth. Sergeant Firlik testified that the call

7

came over the police radio as "an underage drinking party with a possible . . . drug overdose."  (Police Defendants' Motion, Ex. 17, Firlik Dep. at 11-12.)[6]  Upon arriving at Plaintiffs' home, the officers were met outside the home by Mr. VanOverbeke, who was agitated and expressed concern for his daughter's well-being.  According to the transcript of a recording made from microphones worn by the police officers during the incident, Mr. VanOverbeke stated (i) that "[m]y daughter is in that room right there [in Plaintiffs' home], and she can barely speak," (ii) that his daughter "was here at a party," (iii) that he and his wife "called" and "wanted to talk to her" but arrived to discover that "she's incoherent" and "supposedly doesn't have any idea what happened to her," and (iv) that he had been inside the house to see his daughter and then "walked back out," while his daughter remained inside.  (Police Defendants' Motion, Ex. 2, Videotape Tr. at 2.)

As the officers spoke to Mr. VanOverbeke, Mrs. Cheolas came outside to meet them.  The transcript reflects the following discussion among the officers, Mrs. Cheolas, and Mr. VanOverbeke:

> POLICE OFFICER #1:     Have you been home all night?
>
> MRS. CHEOLAS:   All night.
>
> POLICE OFFICER #1:     Is she on medication for anything?

---

[6]The other Defendant officers testified similarly.  Officer Emmendorfer stated that he responded to a dispatch reporting a situation with possible drug involvement.  (Police Defendants' Motion, Ex. 16, Emmendorfer Dep. at 17.)  Detective Teatsorth recalled that the dispatch reported a "female [that] had been possibly drugged at a party."  (Police Defendants' Motion, Ex. 36, Teatsorth Dep. at 21.)  Officer Silva testified that the dispatch made reference to a young girl who possibly had a drug slipped into her drink.  (Police Defendants' Motion, Ex. 33, Silva Dep. at 11-12.)

8

MR. VANOVERBEKE:      I don't know.

POLICE OFFICER #1:      How old is she?

MRS. CHEOLAS:   Fifteen.

POLICE OFFICER #1:      Fifteen.  So you don't think she's on any medication; you don't know what she's on?

MRS. CHEOLAS:   Ask her father.  I don't know that she's on any medication at all.

POLICE OFFICER #1:      Well, who's got custody of her?

MRS. CHEOLAS:   Just her dad, and her mom's in the house.  Do you need to go in?

POLICE OFFICER #1:      Yeah, we got to check her out.

MRS. CHEOLAS:   I'll — just hang on a minute, okay, sweetie.  Thank you.  Is there a reason you need to come in?

POLICE OFFICER #1:      Yeah.  We got called over here.  She's unconscious; we want to check her out.

MRS. CHEOLAS:   She's not unconscious.

POLICE OFFICER #1:      That's the call we have.

MRS. CHEOLAS:   Just a minute.

POLICE OFFICER #1:      The mother is in the house?

MR. VANOVERBEKE:      My mother — my wife is in the house.  The father's a lawyer, the homeowner is a lawyer, okay.

POLICE OFFICER #1:      So who called the police?

MR. VANOVERBEKE:      I called, I called.

POLICE OFFICER #1:      It's his daughter in the house.  Did you talk to

9

your — is it your ex-wife here?

MR. VANOVERBEKE:     It's not my ex-wife; it's my wife.

POLICE OFFICER #1:     Is she intoxicated?

MR. VANOVERBEKE:     My wife's not intoxicated.  We just came here to see our daughter because our daughter was at a party here.  We couldn't get her to call.  We called here and we wanted to talk to her about going to church in the morning and we can't even get her to come to the phone, so we came to the house, and this is what we came to.

POLICE OFFICER #1:     She isn't letting you in the house?

MR. VANOVERBEKE:     This would be really good if my daughter is in there passing away and they won't even let me go in the house.

POLICE OFFICER #1:     Let's go in the house.

MR. VANOVERBEKE:     I mean, it's an emergency.

MRS. CHEOLAS:   Take your daughter and — I just — I want —

POLICE OFFICER #1:     Step aside.

MRS. CHEOLAS:   No.

POLICE OFFICER #1:     Step aside.

MR. VANOVERBEKE:     This could be life or death and necessary —

MRS. CHEOLAS:   Excuse me.

MR. CHEOLAS:     I got her.

MR. VANOVERBEKE:     This is my daughter.

MR. CHEOLAS:     I got her, I got her.

MRS. CHEOLAS:   Leave me alone.

10

POLICE OFFICER #1:  Where is she, ma'am?

(*Id.* at 2-5.)

As indicated in the latter portion of this transcript, Mrs. Cheolas declined the officers' initial request that they be allowed into her home.  Rather, she has testified that she "asked [Sergeant Firlik] if he needed to come in and he responded yes, and I said can I have a minute, because I wanted to talk with my husband."  (C. Cheolas Dep. at 203.)[7] According to Mrs. Cheolas, she reentered her house and spoke to her husband, who "was telling me to just go ahead, just let them in," but before she could take any action, the officers "just walked in."  (*Id.* at 205-06.)  Sergeant Firlik, in contrast, has testified that he initially agreed to Mrs. Cheolas's request that she be allowed to bring Phelicia VanOverbeke out of her home, but that he elected to enter the residence when some time passed and he heard someone in the house yelling "[w]here is the ambulance?"  (Firlik Dep. at 42-43.)  Sergeant Firlik further testified that Mrs. Cheolas stood "right in front of the door" and pulled the door shut as he tried to enter the residence, and that she "put up resistance" and "would not get out of my way."  (*Id.* at 46, 49-51.)

According to Sergeant Firlik, once he entered Plaintiffs' home, he was directed to the den, where he observed Phelicia VanOverbeke looking "very pale, semi[-]conscious," and "very groggy," with "a pail where she had been vomiting" sitting nearby.  (*Id.* at 51.) Officer Emmendorfer similarly testified that the girl "was slumped over, incoherent," that

---

[7]Mrs. Cheolas and Sergeant Firlik were well acquainted with each other, having both worked for the City of Harper Woods for many years.

11

she had "difficulty talking," that she appeared to have vomited, and that she smelled of alcohol. (Emmendorfer Dep. at 66-68.) Shortly after the officers entered the home, they summoned the three EMS paramedics on the scene — Defendants Merico Foleta, Patrick Rollison, and Kenneth Kogelmann — into the residence to assist them, and Defendant Foleta has testified that when he first observed Phelicia VanOverbeke, she was seated with her head over a garbage can and "spitting and dry-heaving." (Police Defendants' Motion, Ex. 18, Foleta Dep. at 20-21.) Upon questioning by Defendant Foleta, the girl denied any drug use, admitted that she had been drinking, but stated that she did not know what type or how much alcohol she had consumed. (*Id.* at 21-22.) The paramedics observed Phelicia, checked her pulse, and offered transportation or treatment for her condition, but Mrs. VanOverbeke, a registered nurse, declined this offer, and instead indicated that she would take her daughter to the hospital herself. The paramedics assisted Phelicia outside and her parents then took her to a local hospital, where she registered a blood alcohol level of 0.18[8] and remained until the next morning.

In the meantime, the police officers became aware that other minors were in the basement of Plaintiffs' home, and they wanted to check on their condition. Mrs. Cheolas requested permission to bring the children upstairs one by one to meet with the police, and Sergeant Firlik agreed to this request. (*See* C. Cheolas Dep. at 221; Firlik Dep. at

---

[8] By way of comparison, Michigan law prohibits an individual over the legal drinking age of 21 from operating a motor vehicle with a blood alcohol content of 0.08 or more. Mich. Comp. Laws § 257.625(1)(b). This level drops to 0.02 for drivers under the age of 21. Mich. Comp. Laws § 257.625(6)(a).

12

58.)  Upon interviewing the first youth who was brought upstairs, however, the officers

learned that there were a large number of minors in the basement, many of whom had

been drinking, and they decided to go downstairs.  (*See* Firlik Dep. at 60; Emmendorfer

Dep. at 56.)  At this point, Plaintiffs' son Nicholas evidently was the only adult member

of the family present in the home, with Mr. and Mrs. Cheolas apparently having stepped

outside, and he has testified:

> I asked [Sergeant Firlik] if they were going downstairs.  He said yes.
> I was still under the impression that the previous agreement reached
> between the police officers and my parents was being honored, whereby we
> would bring up the children one by one from the basement, they would be
> questioned and Breathalyzed.  I was still under the impression that that
> agreement was in effect.  I asked him, you know, would you — something
> along the lines of do you want to go tell my parents, and he responded if
> you want to go tell them, go tell them, but we're going downstairs, and I
> said okay and they entered the basement.

(Police Defendants' Motion, Ex. 12, N. Cheolas Dep. at 79.)  Mr. Cheolas has testified

that he gave his permission for Sergeant Firlik to search the basement, although he

recalled that one or more officers had already been down to the basement before seeking

this permission.  (*See* Police Defendants' Motion, Ex. 13, S. Cheolas Dep. at 388-89, 396-

97.)

　　　　While in the basement, the police officers administered breathalyzer tests to each

of the minors.  Nineteen of those tested registered a blood alcohol content greater than

0.02, with six of these minors registering above 0.08, while one more child registered a

blood alcohol content of 0.01.  Breathalyzer tests of twelve other children reflected a

blood alcohol content of 0.00.  The officers also discovered several bottles of liquor in the

13

basement, and Mr. Cheolas and his son Nicholas found two additional bottles of hard liquor after the officers left. Once all of the children had been picked up by their parents, the police officers left the premises at around midnight.[9]

## C.     The Subsequent Investigation and Bringing of Charges Against Plaintiffs

Following the April 24, 2004 party, the Defendant police officers and paramedics prepared reports recounting the incident, and most of the police officers also prepared supplemental reports. In addition, the Harper Woods city manager, Defendant James Leidlein, summoned Sergeant Firlik to his home on Sunday, April 25, 2004 to discuss the incident. An investigation was launched, with Defendant Detective William Snider in charge and Defendant Detective David Sheill providing assistance. In the course of this investigation, the detectives interviewed 33 children who were present at the party at Plaintiffs' home, as well as one adult, Mary Jo Picklehaupt. According to Detective Snider, Mr. and Mrs. Cheolas and their daughter Alexandra were invited to meet with the detectives and give their version of the events at the party, but they declined to do so. (*See* Police Defendants' Motion, Ex. 34, Snider Dep. at 94-95; *see also* C. Cheolas Dep. at 238-39.) At the conclusion of this investigation, Detective Snider gave the city attorney, Defendant Russell LaBarge, all of the police reports, witness statements, and audio recordings, as well as his own narrative report of his investigation.

_____

[9]As a result of their underage drinking, most of the minors who had a positive blood alcohol level were required to perform community service and/or attend alcohol guidance classes.

On May 18, 2004, Plaintiffs were charged with misdemeanor violations of two Harper Woods ordinances, including permitting minor children to be present at a gathering where alcoholic beverages are served and contributing to the delinquency of a minor. Mrs. Cheolas also was charged with resisting and obstructing a police officer. In July of 2004, city attorney LaBarge offered to dismiss the charges against Mr. Cheolas if Mrs. Cheolas pled no contest to two of the three charges against her and resigned from her position with the City of Harper Woods, but this offer was rejected. In mid-August of 2004, Defendant LaBarge threatened to amend the charges against Mrs. Cheolas to include nineteen separate counts of contributing to the delinquency of a minor — one for each minor found to have consumed alcohol at Plaintiffs' residence on April 24 — if she did not accept his earlier plea bargain, (*see* Plaintiffs' Response to Police Defendants' Motion, Ex. 4), but Plaintiffs again rejected this offer. Finally, Defendant LaBarge made an August 18, 2004 offer under which (i) Mrs. Cheolas would plead no contest to each of the three charges and the charges would be dismissed after a year if there were no related incidents, and (ii) she would resign from her Harper Woods employment with deferred retirement, (*see* Plaintiffs' Response to Police Defendants' Motion, Ex. 5), but this plea bargain also was rejected.

On August 26, 2004, the charges against Mr. Cheolas were dismissed without prejudice. On May 9, 2005, a state district court judge granted Mrs. Cheolas's motion to dismiss the charges against her, concluding that the police officers' initial entry into Plaintiffs' home was unlawful because "[t]he ranting and raving of a distraught father

15

does not allow the police officer to bust into a house." (Police Defendants' Motion, Ex. 5, 5/9/2005 Hearing Tr. at 21, 25.) On appeal, however, a state circuit court judge reinstated the charges and remanded the matter for trial, finding that the police officers "had a right to go in and investigate for themselves" in the wake of Mr. VanOverbeke's 911 call, and that Mrs. Cheolas's arguments regarding the unlawfulness of the ensuing police activity in her home should be heard and resolved under a more complete record at trial. (Police Defendants' Motion, Ex. 6, 9/16/2005 Hearing Tr. at 14-18.)

On remand, the district court judge conducted a two-day bench trial on January 9 and 10, 2006. At the close of the prosecution's case, the trial court granted Mrs. Cheolas's motion for a directed verdict, holding (i) that the defense was not barred from relitigating the lawfulness of the police officers' initial entry into Plaintiffs' home, (ii) that this entry could not be justified by a need to provide emergency aid to someone inside the home, and (iii) that, even if the initial entry was justified by some sort of emergency, the police were required to leave the premises once the VanOverbekes left with their daughter and the emergency had abated. (*See* Police Defendants' Motion, Ex. 7, 1/10/2006 Trial Tr. at 212-14.) Accordingly, Mrs. Cheolas was acquitted of all charges.

**D.    The Termination of Mrs. Cheolas's Employment**

On May 17, 2004, the Harper Woods city manager, Defendant Leidlein, prepared a memo to Mrs. Cheolas reviewing the then-recent April 24, 2004 incident at her home and addressing the possible impact of this incident upon her employment with the City. (*See*

16

City's Motion, Ex. 1.)  Mrs. Cheolas responded to this memo on May 26, 2004, providing a detailed paragraph-by-paragraph refutation of Mr. Leidlein's "unfairly accusatory and falsely conclusive" statements in his letter.  (City's Motion, Ex. 2.)  On June 9, 2004, Mr. Leidlein sent Mrs. Cheolas a one-page letter stating that he had reviewed her response and determined "that the misdemeanor charges against you are valid and justified," and informing her that she was suspended from her job without pay "until these charges are adjudicated or otherwise resolved."  (City's Motion, Ex. 3.)

While the criminal proceedings against Mrs. Cheolas remained pending, Mr. Leidlein wrote to her on July 18, 2005 and informed her that her employment was "terminated effective immediately."  (City's Motion, Ex. 4.)  Although Mr. Leidlein opined that Mrs. Cheolas was an at-will employee and therefore could be terminated without cause, he nonetheless explained that "the basis centers around your actions on the night of April 24, 2004 when you had a large party at your residence where a significant number of juveniles were consuming alcohol."  (*Id.*)  Mr. Leidlein further stated that Mrs. Cheolas's termination was warranted by her "response to the police and emergency medical personnel who were summoned to your home to give assistance to a child in need of medical attention."  (*Id.*)  In a letter dated August 1, 2005, Mrs. Cheolas responded that the termination of her employment was "wrongful and illegal and perhaps in retaliation for my exoneration of" the criminal charges against her,[10] and was also "prompted by the

---

[10]At the time, the state district court had dismissed these charges but the prosecutor had appealed this dismissal.

17

fact that I pointed out in a court of law and otherwise that there had been a fabrication and falsification of evidence by police officers and others."  (City's Motion, Ex. 5.)[11]

## E.    The Federal Claims Asserted in Plaintiffs' Complaint

This suit followed on April 21, 2006.  Plaintiffs' 22-count complaint includes the following federal claims:

> (i)  Count I, asserting Fourth Amendment claims of unreasonable search and seizure against the City and the Police Defendants;

> (ii)  Count II, asserting Fourteenth Amendment substantive due process claims against all of the Defendants, arising from Defendants' alleged fabrication of evidence, false statements at trial, and initiation and continuation of a criminal prosecution despite a lack of probable cause or supporting evidence;

> (iii)  Count IV, alleging a conspiracy among most of the Defendants to violate Plaintiffs' federal constitutional rights to substantive and procedural due process by unlawfully entering their home, fabricating evidence, initiating and continuing a criminal prosecution against them, engaging in bad-faith plea negotiations, and terminating Mrs. Cheolas's employment with the Defendant City;

> (iv)  Count V, alleging a conspiracy among the City, its police department, the Police and EMS Defendants, and the VanOverbekes to violate Plaintiffs' federal constitutional protections against unlawful entry into their home and wrongful criminal prosecution without probable cause;

> (v)  Count VII, alleging a conspiracy among most of the Defendants to violate Plaintiffs' federal constitutional protection against seizure without probable cause and their rights to due process and equal protection by acting in concert to prosecute Plaintiffs without probable cause or

---

[11]Although Mrs. Cheolas has asserted federal employment discrimination claims arising from her discharge, there is no indication in the complaint or elsewhere in the record that she filed any charges of gender or age discrimination with the Equal Employment Opportunity Commission ("EEOC") or its Michigan counterpart, nor that she received a right-to-sue letter prior to bringing this suit.

supporting evidence, engage in bad-faith plea negotiations, fabricate or withhold evidence, and seek the termination of Mrs. Cheolas's employment with the Defendant City;

      (vi)  Count VIII, alleging a conspiracy among the Police and EMS Defendants and the investigating Harper Woods detectives to violate Plaintiffs' federal constitutional rights by unlawfully entering Plaintiffs' home, fabricating evidence, and purposefully omitting exculpatory evidence and making false statements in their reports; and

      (vii)  Count XXII, alleging that the Defendant City and city manager Leidlein terminated Mrs. Cheolas's employment with the City on account of her gender and/or age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[12]

Through the present motions, the Police and EMS Defendants, the Defendant City of Harper Woods and its police department, and Harper Woods city manager James Leidlein seek an award of summary judgment in their favor on each of these federal claims, as well as the state-law claims asserted against them in Plaintiffs' complaint.

## III. <u>ANALYSIS</u>

## A.    The Standards Governing Defendants' Motions

Through the present pair of motions, the moving Defendants seek summary judgment in their favor on each of Plaintiffs' claims against them.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

---

[12]Plaintiffs also asserted two additional federal claims in counts III and VI against Defendant attorneys Russell LaBarge and Sharon DeWaele, but these claims were dismissed in the Court's earlier February 13, 2009 opinion and order.

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.     The Police and EMS Defendants Did Not Violate Plaintiffs' Fourth Amendment Rights in Their Initial Entry into Plaintiffs' Home.**

Although Plaintiffs' complaint cuts a wide swath through the U.S. Constitution in its several claims brought under 42 U.S.C. § 1983, appealing variously to the protections

afforded under the Fourth, Fifth, Sixth, and Fourteenth Amendments, Plaintiffs

acknowledge in their response to the Police and EMS Defendants' motion that they are

pursuing only two such § 1983 claims, each grounded in the Fourth Amendment.  First,

they allege that the Defendant officers' warrantless entry into their home and ensuing

searches and seizures within their residence violated their rights under the Fourth

Amendment.  Next, they charge Defendants with fabricating evidence and preparing false

police reports, resulting in their malicious prosecution without probable cause in violation

of the Fourth Amendment.  The Court addresses each of these claims in turn.

As this Court stated in an earlier case involving allegations of underage drinking at

a party at a private residence:

> It is a fundamental tenet of Fourth Amendment jurisprudence that
> "searches and seizures inside a home without a warrant are presumptively
> unreasonable."  *United States v. Rohrig,* 98 F.3d 1506, 1513 (6th Cir. 1996)
> (quoting *Payton v. New York,* 445 U.S. 573, 586, 100 S. Ct. 1371, 1380
> (1980)).  "The physical entry of the home is the chief evil against which the
> wording of the Fourth Amendment is directed," and "the warrant procedure
> minimizes the danger of needless intrusions of that sort."  *Payton,* 445 U.S.
> at 585-86, 100 S. Ct. at 1379-80 (internal quotations, citation, and footnote
> omitted).  Absent a warrant, only "exigent circumstances" may justify
> governmental entry into a private home.  *See Payton,* 445 U.S. at 590, 100
> S. Ct. at 1382; *Rohrig,* 98 F.3d at 1515.

*Strutz v. Hall,* 308 F. Supp.2d 767, 776 (E.D. Mich. 2004).  Here, as in *Strutz,* the

Defendant police officers and EMS paramedics did not secure a warrant before entering

Plaintiffs' home.  Consequently, this entry may be justified, if at all, only by an appeal to

exigent circumstances.

Specifically, the Police and EMS Defendants contend that their entry into

21

Plaintiffs' residence was consistent with the recognized authority of law enforcement officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006). As the Supreme Court has explained, in determining whether a warrantless entry is justified by this or other exigent circumstances, the subjective motivation or state of mind of the entering officer is immaterial, "as long as the circumstances, viewed *objectively,* justify [the] action." *Stuart,* 547 U.S. at 404, 126 S. Ct. at 1948 (internal quotation marks and citation omitted) (emphasis and alteration in original). Moreover, in making this determination, this Court must "consider the totality of the circumstances and the inherent necessities of the situation at the time." *Rohrig*, 98 F.3d at 1511 (internal quotation marks and citations omitted).[13]

---

[13]As noted earlier, the state courts addressed the issue of exigent circumstances in the course of the criminal prosecution of Mrs. Cheolas. In their briefing on the Police Defendants' summary judgment motion, the parties debate the extent to which this Court might be bound by the state court rulings on this issue.

As both sides evidently recognize, Defendants are not bound by any adverse state court rulings as to the lawfulness of the entry into Plaintiffs' home, as they are not considered under Michigan law to be in privity with the prosecution in the state criminal proceedings. *See, e.g., Hardesty v. Hamburg Township,* 461 F.3d 646, 651 (6th Cir. 2006); *Strutz,* 308 F. Supp.2d at 775-76. The closer question, however, is whether Plaintiffs are bound by the state circuit court decision reversing the district court's ruling that the entry was unlawful and remanding the matter for trial. In announcing this decision, the circuit court certainly came very close to explicitly ruling that the police acted lawfully in entering Plaintiffs' home. (*See* Police Defendants' Motion, Ex. 6, 9/16/2005 Hearing Tr. at 14, 16.) On remand, however, the district court found that this ruling was not the law of the case as to the question of illegal entry, but that the circuit court instead had merely intended that the trial court "hear additional testimony and hear further arguments" on this issue. (*See* Police Defendants' Motion, Ex. 7, 1/10/2006 Trial Tr. at 212.) While this is a debatable reading of the circuit court decision, this Court accepts, for

22

As Defendants point out, the Sixth Circuit recently addressed a somewhat similar claim of exigent circumstances in *Hardesty v. Hamburg Township,* 461 F.3d 646, 655-56 (6th Cir. 2006). In that case, the police had arrested a minor at approximately 2:00 a.m. for drunk driving, and she told the arresting officer that she had been consuming alcohol at the plaintiff's home. Upon arriving at this residence to investigate, the police pounded on the front door but received no response, and a telephone call to the residence also went unanswered. The officers then went around to the back of the home and looked through a window and sliding glass door, where they observed a young man lying on a couch who appeared to have blood on his hands and pants. When efforts to wake this man by shining flashlights in his face and pounding on the window proved unavailing, the police entered the house and found the plaintiff and two friends, all of whom were under the age of 21 and smelled of alcohol,[14] as well as a number of empty and half-full beer cans. The officers administered breath tests and issued tickets to all three young men for being minors in possession of alcohol.

Judge Feikens of this District held that the officers' warrantless entry into the plaintiff's home was justified by exigent circumstances, and the Sixth Circuit agreed. The court explained:

> Even taking the facts in the light most favorable to Plaintiffs, there

_____

present purposes, the state district court's conclusion that Mrs. Cheolas was not precluded from continuing to challenge the lawfulness of the entry into her home.

[14]One of these young men was the person who the police had observed lying on the couch. While he did have blood on his hands, he was not in need of medical attention.

23

was a basis for the officers to reasonably believe a medical emergency
existed. The reason for their visit to [the plaintiff's] residence was a report
that minors were consuming alcohol there that night. Upon arriving at the
back door they saw a person lying on a couch who did not respond to loud
knocking on the door and window or bright lights shining in his face.
Given the known dangers of excessive alcohol consumption pointed out by
the district court, under these circumstances the officers could have
reasonably believed that the individual on the couch was suffering from
alcohol poisoning. That reasonable belief was a sufficient basis for entering
the [plaintiff's] residence without a warrant or consent. Since the exigent
circumstances exception to the warrant rule applied, the officers did not
violate the Fourth Amendment when they entered the [plaintiff's] home.

*Hardesty,* 461 F.3d at 656.

In *Strutz,* 308 F. Supp.2d at 776-80, by contrast, this Court found that the

defendant police officers had not established, at least as a matter of law, that their

warrantless entry into the plaintiffs' home was justified by exigent circumstances. In that

case, the defendant officers were dispatched to the plaintiffs' home to investigate a report

of a loud party with possible underage drinking. As they approached the door, the

officers observed a bottle of alcohol on the porch, as well as several individuals running

up the stairs to the second floor of the residence. The officers knocked on the door and

were greeted by the plaintiff homeowners, who explained that only family and perhaps a

few friends or relatives were present and that, so far as they knew, no minors had been

drinking on the premises.[15] The plaintiffs then complied with the officers' request that

_____

[15]In fact, the plaintiffs' two teenaged children, ages 18 and 17, had invited a few of their
friends over to the house while their parents went to dinner and a movie, and then several more
teenagers had arrived unannounced at the home, prompting the plaintiffs' teenaged daughter to
page her parents and ask them to come home early to assist in restoring order. Upon arriving
home, the plaintiffs asked whether anyone had been drinking but nobody admitted having done
so, and they detected an odor of alcohol but otherwise believed that the situation was under

24

their children be brought to the door, and the officers detected the odor of alcohol from one of the children and observed that the other child appeared intoxicated and glassy-eyed.  Based on these observations, the officers stated their intention to administer preliminary breath tests on the two children, but the plaintiffs refused to either permit their children to leave the home or allow the officers to enter to administer these tests.  As the plaintiffs began to close the door to their home, the officers forced it open and, in the ensuing struggle, pepper-sprayed the plaintiffs and placed them in handcuffs.  They then administered breath tests on all of the teenagers found on the premises, which revealed that seven of the fourteen minors had been drinking.

The defendant police officers argued that their warrantless entry into the plaintiffs' home was a justifiable exercise of their "community caretaker" function as recognized by the Sixth Circuit in *Rohrig, supra,* but this Court disagreed:

> Upon careful consideration . . . , the Court finds that Defendants' appeal to their "community caretaking" role fails at the very threshold, at least so far as can be determined as a matter of law under the present record. The lynchpin of any effort to rely upon a "community caretaker" justification for a warrantless entry is that the governmental action in question must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973).  Such was the case in *Rohrig,* where the officers entered the defendant's residence without any intent to investigate a suspected criminal violation or any expectation that they might discover evidence of such a violation.  Instead, they merely sought to quell an ongoing and highly objectionable nuisance that was disturbing the neighborhood peace in the middle of the night. *Compare United States v. Williams,* 354 F.3d 497, 507-08 (6th Cir. 2003)

---

control.

25

(distinguishing *Rohrig* on the ground that, in the present case, "the agents' motives in entering were arguably not as pure," but instead rested in part upon suspicions of drug-related activity within the premises).

Matters are far different here, at least under the evidence as viewed most favorably to Plaintiffs.  First, while Defendants maintain that their sole purpose in seeking entry into the home was to check upon the well-being of the children on the premises, the deposition testimony of [plaintiff] Michael Strutz on this point casts this claim in a somewhat different light.  According to Mr. Strutz, the Defendant officers requested that his children come out of the house or that the officers be let in so that they could administer a preliminary breath test ("PBT") to the children.  There is no mention in his testimony of a more generalized concern for the safety and well-being of his children . . . .

There is an important distinction, in the Court's view, between checking to see whether an individual might need medical attention or might otherwise be in need of emergency assistance, on one hand, and performing a test designed to disclose whether a teenager has been drinking, on the other hand.  Simply stated, the former course of action does not entail the "detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady,* 413 U.S. at 441, 93 S. Ct. at 2528, while the latter surely can lead to evidence of such a violation.  This distinction is confirmed by the facts of this very case, where PBTs were administered to each and every teenager found on the premises following Defendants' warrantless entry, and where citations were issued to all seven teenagers who tested positive for the presence of alcohol in their systems.

To be sure, the Court recognizes that a PBT can be administered in a fashion that is compatible with a purely "community caretaking" role.  It is possible, for example, that such a test could provide important information as to the extent of alcohol consumption, and could alert an officer to the need to take prompt action against an imminent threat of alcohol poisoning or other severe consequences of excessive drinking.  Presumably, however, a PBT is not the *only* means through which an individual's need for medical attention may be ascertained — slurred speech and difficulty in walking or standing surely would be additional indications of a need for intervention.  Yet, the record here fails to reflect that the Defendant officers pursued any such less intrusive measures that would not entail entry into Plaintiffs' home, beyond merely asking that [the plaintiffs' children] be brought to the front door for a visual inspection.

Notably, Mr. and Mrs. Strutz voluntarily complied with this request, thereby providing an opportunity for Defendants to ensure the well-being of the children. Although Defendants have testified to their belief that the children showed some signs of intoxication, this testimony does not establish as a matter of law that the children's appearance gave rise to a legitimate and immediate concern for their safety and welfare. Without in any way diminishing the substantial threat posed by underage drinking, alcohol is not such an inherently dangerous substance that minors who are suspected of having consumed it are in immediate need of medical attention, even in the face of the contrary assessment and assurances of their own parents. Indeed, Defendants implicitly acknowledge as much, stating only that the children's appearance triggered a desire to administer PBTs. Under this record, it must be left to the trier of fact to determine whether Defendants sought only to ensure the welfare of the children, or whether they also sought to achieve law enforcement objectives.

*Strutz,* 308 F. Supp.2d at 778-79.

In this Court's view, the present case is readily distinguishable from *Strutz,* and is more closely analogous to *Hardesty* and the other cases in which warrantless entries have been deemed justified to address a medical emergency. In *Strutz,* the dispatch to which the defendant officers responded advised them of a loud party with possible underage drinking, but there was no report (and the defendant police officers did not profess a belief) that anyone on the premises was in need of medical attention. Upon their arrival at the plaintiffs' home, moreover, the officers uncovered additional evidence of underage drinking, but they neither observed nor acted upon any request or perceived need for emergency medical assistance. Rather, the officers' actions were directed solely at determining whether the plaintiffs' children or any other teenaged guests in the home had engaged in underage drinking. While acknowledging the substantial health risks associated with this activity, this Court nonetheless concluded that the defendant officers

27

had not established as a matter of law that their actions were directed at abating this threat to the health and well-being of the occupants of the plaintiffs' home, as opposed to investigating possible violations of the law.

Here, in contrast, the 911 call placed by Mr. VanOverbeke explicitly reported an "emergency" at Plaintiffs' home, with his daughter having been given drugs at a party. (Police Defendants' Motion, Ex. 1.)  The 911 dispatcher who took the call evidently perceived a possible need for emergency medical assistance, as Mr. VanOverbeke was asked whether EMS should be sent and he responded that "[t]hat would be fine."  (*Id.*) Moreover, the record reflects that when relaying this call to the responding Defendant police officers and EMS paramedics, the dispatcher characterized the situation as involving a young girl who had been drugged or was suffering from a drug overdose.  As they approached Plaintiffs' home, then, the Police and EMS Defendants had ample grounds to believe that they were responding to a request for emergency medical assistance.

To be sure, upon their arrival at Plaintiffs' residence, the Defendant officers were presented with a somewhat different set of facts.  There, they were initially greeted by Mr. VanOverbeke, who stated that his daughter had been at a party inside the home and that she was "incoherent," could "barely speak," and had no "idea what happened to her." (Police Defendants' Motion, Ex. 2, Tr. at 2.)  They then learned, however, that Mr. VanOverbeke had been inside to see his daughter, albeit briefly, that his wife remained inside with their daughter, and that the girl was neither unconscious nor apparently on any

28

medication.  Yet, while this additional information might arguably have mitigated the officers' initial concern that a child inside the house was unconscious or suffering from a drug overdose, none of what they learned would have dispelled the notion that an occupant of the home was in need of immediate medical attention.  To the contrary, Mr. VanOverbeke, who had observed his daughter first-hand, continued to report that there was an "emergency," that his daughter could "barely speak" and was "incoherent," and that "[t]his could be life or death."  (*Id.* at 2-5.)  Thus, even if the information learned by the Police Defendants upon their arrival at Plaintiffs' home might have suggested that the report relayed by the 911 dispatcher was not entirely accurate, this information nonetheless reaffirmed the need to enter the house to render emergency medical aid.

Plaintiffs' principal response to this evidence of exigent circumstances is that "the police entered the house primarily on the urging of Mr. VanOverbeke who was angry and irrational and engaged in hysterical hyperbole," and that the Police Defendants could (and should) have investigated the situation further rather than accepting Mr. VanOverbeke's claim of an emergency at face value.  (Plaintiffs' Response Br. at 21.)  Yet, while the Sixth Circuit has observed that "a 911 call alone [might not] justify a warrantless entry into a private home," the court also has recognized that such a 911 report of an emergency, together with the observations of the police on the scene and "the uncertainty of the situation," may support a finding of exigent circumstances.  *Thacker v. City of Columbus,* 328 F.3d 244, 254 (6th Cir. 2003).  So it is here, where the Police Defendants confirmed the substance, if not all of the precise details, of the 911 emergency dispatch

29

by speaking directly to the caller, Mr. VanOverbeke, at the scene, and where they learned in this conversation that Mr. VanOverbeke had actually seen his daughter and personally observed that she was incoherent, could barely speak, and seemingly had no idea what had happened to her. *See Strutz,* 308 F. Supp.2d at 780 (noting that the Court's analysis in that case "might well be different in the face of a continuing disturbance or evident underage drinking, particularly by teenaged guests as opposed to a household's own children").

Indeed, even if the Police Defendants had investigated the situation further as Plaintiffs now suggest, it is not clear what they would have found that would have dispelled their belief that emergency medical assistance was required. Although Mrs. Cheolas advised them that the girl inside her house was "not unconscious" and that her mother was with her, she in no way represented to or otherwise assured the officers that the girl was not in need of medical attention. To the contrary, Mrs. Cheolas testified at her deposition that, in her view, there was no need for EMS paramedics to enter her home and provide medical assistance to Phelicia VanOverbeke because her mother was a "registered nurse" who had "far more education and ability than a paramedic," so that she "assumed that [Mrs. VanOverbeke] would be able to handle her daughter." (C. Cheolas Dep. at 59.) Far from dispelling the notion that Phelicia VanOverbeke was in need of medical assistance, this testimony seemingly establishes that medical treatment *was* necessary, but that it could be adequately provided by Mrs. VanOverbeke, a registered nurse. There is no evidence that the Police Defendants were aware at the time of Mrs.

30

VanOverbeke's medical background and training — and, even if they were, this Court knows of no authority for the proposition that police officers must ascertain and assess the credentials and ability of those already on the scene to provide emergency medical aid before they may enter a home and attempt to confirm for themselves whether such assistance is being adequately provided. *Cf. Rohrig,* 98 F.3d at 1524 ("[W]e emphatically reject the notion that a warrantless entry is permissible only when all conceivable alternatives have been exhausted.").

Moreover, the Police and EMS Defendants' observations upon entering Plaintiffs' home, and the additional information that they learned, belie any contention that Phelicia VanOverbeke's need for medical attention was entirely a figment of her parents' imagination. The officers and EMS paramedics uniformly testified that Phelicia VanOverbeke was obviously intoxicated, pale, groggy, had difficulty talking, and appeared to have vomited — observations which, of course, closely paralleled the statements of Mr. VanOverbeke when the officers first arrived on the scene. The girl then confirmed that she had been drinking, but was unable to identify the type or volume of alcohol she had consumed. A subsequent hospital visit revealed a blood alcohol content of 0.18, over twice the level at which an individual of legal drinking age is considered too impaired to drive, and Phelicia was kept at the hospital overnight. Even with perfect knowledge of the situation, then, the Police and EMS Defendants surely would have had an objectively reasonable basis for concluding that a child at Plaintiffs' home was in need of emergency medical care. *Compare United States v. Huffman,* 461 F.3d 777, 785 (6th

31

Cir. 2006) (observing that a warrantless entry "may not be held unconstitutional simply because the reasonable concerns of the officers were not substantiated after-the-fact"). It follows that their warrantless entry into Plaintiffs' home was lawfully justified by exigent circumstances.

## C. The Police Defendants Did Not Violate Plaintiffs' Fourth Amendment Rights by Entering Their Basement to Investigate the Condition of the Other Children at the Home.

Apart from challenging the lawfulness of the Police and EMS Defendants' initial entry into their home, Plaintiffs also contend that the Police Defendants committed further Fourth Amendment transgressions once they were within the home. Specifically, Plaintiffs assert that any possible medical emergency had dissipated once Phelicia VanOverbeke was taken from their home, and that the Police Defendants therefore were obligated to leave at that time. Instead, they proceeded to enter the basement of Plaintiffs' home, to investigate whether other children had been drinking and to administer breathalyzer tests. In Plaintiffs' view, these additional activities, carried out without a warrant, cannot be justified by exigent circumstances or on any other ground. As explained below, the Court disagrees.

As Plaintiffs correctly observe, a warrantless entry grounded in exigent circumstances must be limited in scope to the exigency that justified the entry. *See United States v. Johnson,* 22 F.3d 674, 680 (6th Cir. 1994). In this case, the Police Defendants' warrantless entry was grounded in an effort to provide emergency aid in response to a 911 call requesting this assistance. This specific subject of this call, of

32

course, was Phelicia VanOverbeke, and the Police and EMS Defendants ultimately were able to observe and speak to her and ensure that she was given any necessary medical attention.  Once this task was accomplished, however, Plaintiffs argue that the Police Defendants' mission was at an end, and that their continued presence and further activities in Plaintiffs' home could no longer be justified by exigent circumstances.

This contention, however, rests upon an overly narrow view of the exigency with which the Police Defendants were confronted at Plaintiffs' home.  As they were attending to Phelicia VanOverbeke, the Defendant officers quickly learned that there were a large number of other children in attendance at the party in Plaintiffs' basement.  According to Mrs. Cheolas, the officers expressed an interest in checking on the condition of these other children, and they agreed to her suggestion that Plaintiffs (or their son Nicholas) would bring the youths upstairs one at a time to meet with the officers.  Upon speaking with the first of these children, the officers learned that of the thirty or so teenaged partygoers in the basement, half or more had been drinking.  At this point, the officers decided to go downstairs and investigate the conditions in the basement for themselves.

Viewed under the totality of these facts and circumstances known to the officers at the time, it is clear that the exigency that necessitated the Police Defendants' warrantless entry could not be narrowly limited to one child, Phelicia VanOverbeke.  Rather, the officers had at least some basis for concern that other children in the basement might also have been drinking excessively, and thus could also be in need of medical attention. Plaintiffs evidently did not disagree, but instead suggested a less intrusive way for the

33

officers to address this concern.  The officers did not pursue a more intrusive course of action until they had uncovered additional facts that triggered a heightened concern for the health and well-being of the children in Plaintiffs' home.  Under this record, the Court cannot say that the Police Defendants' activities exceeded the scope of the exigency that justified their entry into Plaintiffs' home.

Although Plaintiffs offer a number of arguments in an effort to avoid this conclusion, the Court finds none of them persuasive.  First, Plaintiffs contend that once Phelicia VanOverbeke left their house, the Defendant officers "had no reason to believe that anyone else in the home had been drinking."  (Plaintiffs' Response Br. at 24.)  Yet, even if this was initially true, the officers soon learned, upon talking to the first of the children brought upstairs to meet with them, that there had been widespread drinking among half or more of the youths at the party.  Because Plaintiffs admittedly consented to — and, indeed, suggested — this initial investigative measure of bringing the children upstairs one at a time to meet with the police, they can hardly complain of any Fourth Amendment violation arising from this procedure.  *See United States v. Campbell,* 317 F.3d 597, 608 (6th Cir. 2003) (confirming that a warrantless entry into or search of a home is not prohibited "where voluntary consent has been given to the search by the owner of the home or property").

Plaintiffs next insist that "even if juveniles had been drinking, there was no reason to believe that anyone was seriously intoxicated or in need of immediate medical attention."  (Plaintiffs' Response Br. at 24.)  Yet, given the Defendant officers' direct

34

observation of at least one child in need of immediate medical attention due to excessive drinking (Phelicia VanOverbeke), and given the solid grounds for their belief (which they subsequently confirmed) that many other children in the basement had also been drinking, it would have been irresponsible for the officers to assume that no other children were in need of medical assistance.  Certainly, Plaintiffs could provide no such assurance, where they admittedly were unaware that one of their guests (Phelicia VanOverbeke) had been drinking excessively and was in need of medical attention until they sought her out in the basement to return her parents' phone call.  Moreover, even after Plaintiffs learned that one of their young guests had become ill from drinking and they attempted to ascertain whether other children had been drinking, they were met with denials which, in hindsight, they acknowledge were not truthful.  (*See* C. Cheolas Dep. at 220; N. Cheolas Dep. at 42-43, 55-56.)  It is simply not tenable for Plaintiffs, on the one hand, to deny any knowledge of underage drinking at their home, while at the same time contending that the Defendant officers should have relied on their assurances that there were no additional children in their home who were in need of medical attention.

Finally, Plaintiffs point to certain evidence which, in their view, shows that the Police Defendants' decision to remain in their home and enter their basement was not truly motivated by concerns of health and well-being.  They note, for example, that the EMS paramedics evidently left their home at the same time that Phelicia VanOverbeke departed, without staying to ensure that no other children were in need of medical attention.  Moreover, as this Court observed in *Strutz,* 308 F. Supp.2d at 778, the police

35

officers' decision to administer breathalyzer tests to each child in the basement arguably tends to suggest that they were acting in furtherance of law enforcement objectives, and not necessarily in their "community caretaking" role.

Viewing the record as a whole, however, the Court finds that the Defendant officers had a sufficient basis for concluding that exigent circumstances warranted their continued presence in Plaintiffs' home and their entry into the basement.  As an initial matter, to the extent that Plaintiffs question the Police Defendants' true motives, the Supreme Court has emphasized that the Fourth Amendment "reasonableness" inquiry is governed by an objective standard, and that a police officer's "subjective motivation is irrelevant." *Stuart,* 547 U.S. at 404, 126 S. Ct. at 1948.  Thus, whether or not the Defendant officers actually perceived a continuing risk to the health and well-being of the children in Plaintiffs' home or acted in accordance with such a belief, their actions nonetheless survive Fourth Amendment scrutiny if the circumstances they faced, viewed objectively, would justify these actions.  Moreover, as this Court expressly recognized in *Strutz,* 308 F. Supp.2d at 778-79, while a breathalyzer test can be used as a law enforcement tool, it can also "provide important information as to the extent of alcohol consumption, and could alert an officer to the need to take prompt action against an imminent threat of alcohol poisoning or other severe consequences of excessive drinking."  Given the circumstances confronting the Police Defendants at the time, the Court is satisfied that a reasonable officer, armed with the information the Defendant officers had learned and the observations they had made, could properly and lawfully

36

have decided to enter Plaintiffs' basement to determine whether any other children were in need of emergency medical attention.

More generally, the Sixth Circuit has cautioned that "the judicial edifice erected upon [the Fourth] Amendment should not be allowed to obscure the essential [constitutional] requirement that police officers act reasonably when they intrude upon an individual's privacy." *Rohrig,* 98 F.3d at 1524. A proper Fourth Amendment analysis need not (and ought not) be utterly divorced from an appropriate, common-sense understanding and appreciation of the uncertainties that police officers face in the performance of their duties and the practical necessity that they must make split-second judgment calls with less than perfect knowledge. *See Rohrig,* 98 F.3d at 1524. Such an approach "would require [the courts] to ignore the day-to-day and minute-to-minute demands upon police officers, and to instead evaluate their conduct under a standard established with the benefit of hindsight." 98 F.3d at 1524. Rather, this Court's overarching inquiry is to evaluate the Police Defendants' conduct under the "standard of 'reasonableness' that is the touchstone of the Fourth Amendment." 98 F.3d at 1524. Just as in *Rohrig,* 98 F.3d at 1525, this Court is unable to point to anything that the Defendant officers "should have done differently," and finds "nothing in the Fourth Amendment that leads [it] to disapprove of the officers' chosen course of action."

Alternatively, even assuming that any exigency had dissipated once the Police Defendants ensured that Phelicia VanOverbeke was being given any necessary medical aid, the Court finds that Plaintiffs freely and voluntarily consented to the further activities

37

of the Defendant officers in their home.  The law is clear that "[a] search may be

conducted without a warrant if a person with a privacy interest in the item to be searched

gives free and voluntary consent."  *United States v. Riascos-Suarez,* 73 F.3d 616, 625 (6th

Cir. 1996), *abrogated on other grounds by Muscarello v. United States,* 524 U.S. 125,

118 S. Ct. 1911 (1998).  As noted earlier, Plaintiffs consented to — and, in fact,

suggested — the procedure initially followed by the Police Defendants after Phelicia

VanOverbeke departed the premises, whereby children would be brought up from the

basement one by one to be observed and interviewed by the officers.  Moreover, Mr.

Cheolas expressly (and repeatedly) testified at his deposition that Sergeant Firlik asked

him at one point "if he could search the basement," and that he responded "sure."  (S.

Cheolas Dep. at 388-89.)

Yet, Plaintiffs insist that the Police Defendants' attempted reliance on this latter

consent by Mr. Cheolas is unavailing, where Mr. Cheolas testified that Sergeant Firlik,

and perhaps other officers as well, had already gone down to the basement before he gave

his consent to the search.  (*See id.* at 396-97.)  As Plaintiffs point out, consent given after

an illegal entry is not valid unless any taint arising from the initial entry "has been

dissipated before the consent[] to search [is] given."  *United States v. Chambers,* 395 F.3d

563, 569 (6th Cir. 2005) (internal quotation marks and citations omitted).  In a similar

vein, this Court has observed that there ordinarily must be some sort of nexus between a

consent and a challenged search that the government seeks to justify by reference to this

consent.  *See United States v. Brown,* 69 F. Supp.2d 925, 931-32 (E.D. Mich. 1999).

38

Nonetheless, this case law does not sweep nearly as broadly as Plaintiffs would read it. It does not, in particular, stand for the proposition that the legality of a consent search turns upon the "precise timing" of the consent versus the commencement of the search, *Brown,* 69 F. Supp.2d at 931 n.6, such that the Police Defendants' entry into and search of Plaintiffs' basement cannot possibly have been lawfully conducted pursuant to Mr. Cheolas's consent if any activity whatsoever preceded this consent. To the contrary, this Court has previously stated its view that "the reasonableness requirement of the Fourth Amendment arguably is satisfied by a consent given contemporaneously with a search, without the need for split-second determinations of 'which came first.'" 69 F. Supp.2d at 931 n.6. More generally, the courts have invoked the "independent source" doctrine to ensure that "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *United States v. Calhoun,* 49 F.3d 231, 234 (6th Cir. 1995) (internal quotation marks and citation omitted); *see also Brown,* 69 F. Supp.2d at 933. Under this doctrine, a consent is effective to justify a search if the government "did not profit" from its activities prior to the consent — by, for example, uncovering incriminating evidence or otherwise capitalizing on its earlier activities to "creat[e] a coercive atmosphere that led to [the] consent." *Calhoun,* 49 F.3d at 234.

In this case, there is absolutely no evidence that the Police Defendants profited in any way from any activities in which they might have been engaged prior to Mr. Cheolas's consent to search the basement of his home. There is no indication that the

officers uncovered any incriminating evidence in any visits to the basement prior to this consent. Nor does the record suggest that Mr. Cheolas's decision to consent to a search of his basement was influenced in any way by any Police Defendant activities that might have preceded it, much less that his consent could be deemed to be involuntary or coerced in light of these activities. Indeed, it appears from Mr. Cheolas's deposition testimony that he was not even aware of precisely what police activities might have occurred prior to his consent — he did not know exactly which officers might have been down to the basement before he consented to the search, nor did he claim any knowledge of what actions they might have taken. (*See* S. Cheolas Dep. at 396-97.) Moreover, Mr. Cheolas is a lawyer who presumably understood the significance of his consent, and there is no evidence that he was threatened, detained, or mistreated in any way by the Police Defendants. Finally, there is evidence that even before the police arrived at Plaintiffs' home — or, at a minimum, before the Defendant officers had entered the basement — Mr. Cheolas spoke to the children in the basement, warning them that "[t]he police have been called" and that "[i]f they come, you all have to blow Breathalyzers," and urging them to disclose to him whether they had been drinking or whether there was any alcohol in the basement. (N. Cheolas Dep. at 55.) Under this record, viewed in a light most favorable to Plaintiffs, no reasonable trier of fact could conclude that Mr. Cheolas's consent to the search of his basement was in any way tainted by any activities in which the Police Defendants might have engaged prior to this consent, or that this consent was

40

anything other than freely and voluntarily given.[16]

**D.   Plaintiffs Have Failed as a Matter of Law to Establish the Absence of Probable Cause for the Criminal Charges Against Them, as Required to Sustain Their Federal § 1983 Claims of Malicious Prosecution.**

Apart from their § 1983 claims arising from the conduct of the Police and EMS Defendants at their home on the night of their daughter's birthday party, Plaintiffs have asserted one or more § 1983 claims arising from the decision to criminally prosecute them. While the complaint cites various federal constitutional provisions and principles of federal constitutional law as bearing upon the legality of this decision to prosecute, Plaintiffs have acknowledged in the course of their briefing on the parties' summary judgment motions that their claims arising from their criminal prosecution are properly viewed as claims of malicious prosecution founded upon the Fourth Amendment protection against unreasonable seizures. Moreover, the parties agree that, once Plaintiffs' claims are properly viewed in this light, the dispositive issue in resolving Defendants' summary judgment motions is whether the criminal charges against Plaintiffs were supported by probable cause. As explained below, the Court finds that Plaintiffs

---

[16]In light of the Court's conclusion that the Police and EMS Defendants did not commit any constitutional violations in the course of their activities at Plaintiffs' home on the night of April 24, 2004, the Court need not reach the alternative argument of these Defendants that they are entitled to qualified immunity. In addition, any conspiracy claims arising from the activities of these Defendants at Plaintiffs' home cannot succeed, as Plaintiffs acknowledge that "a conspiracy claim does not lie if there is no violation of an underlying constitutional right." (Plaintiffs' Response Br. at 40.) Similarly, in the absence of any such underlying constitutional violation, Plaintiffs' federal claims against the Defendant City arising from the Defendant officers' activities at their home also cannot succeed. *See Scott v. Clay County,* 205 F.3d 867, 879 (6th Cir. 2000).

41

have failed as a matter of law to establish the absence of probable cause, thereby dictating an award of summary judgment in Defendants' favor on Plaintiffs' § 1983 claims of malicious prosecution.

As the Sixth Circuit recently observed, while the precise contours of a § 1983 claim of malicious prosecution "remain uncertain," it is clear that "such a claim fails when there was probable cause to prosecute, or when the defendant did not make, influence, or participate in the decision to prosecute." *Fox v. DeSoto,* 489 F.3d 227, 237 (6th Cir. 2007). The probable cause inquiry, in turn, "turns on whether the facts and circumstances within the [defendant's] knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Lyons v. City of Xenia,* 417 F.3d 565, 573 (6th Cir. 2005) (internal quotation marks, alteration, and citation omitted). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," and "[u]nder this "flexible, common-sense standard, the establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. McClain,* 444 F.3d 556, 562-63 (6th Cir. 2005) (internal quotation marks and citations omitted). "If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant." *Watkins v. City of Highland Park,* 232 F. Supp.2d 744, 754 (E.D. Mich. 2002) (internal quotation marks and citation omitted).

42

The first charge brought against Plaintiffs was under a Harper Woods ordinance, and in turn incorporated the standards of a Michigan statute directed at the consumption or possession of alcohol by minors at a social gathering.  This statute, in pertinent part, prohibits a homeowner or someone having control over property from "[k]nowingly allow[ing] a minor to consume or possess an alcoholic beverage at a social gathering on or within that premises."  Mich. Comp. Laws § 750.141a(2)(a).  The statute defines "allow" as

> to give permission for, or approval of, possession or consumption of an alcoholic beverage . . . , by any of the following means:
>
> (i)  In writing.
>
> (ii)  By 1 or more oral statements.
>
> (iii)  By any form of conduct, including a failure to take corrective action, that would cause a reasonable person to believe that permission or approval had been given.

Mich. Comp. Laws § 750.141a(1)(b).  The statute also provides:

> Evidence of all of the following gives rise to a rebuttable presumption that the defendant allowed the consumption or possession of an alcoholic beverage . . . on or within a premises, residence, or other real property, in violation of this section:
>
> (a)  The defendant had control over the premises, residence, or other real property.
>
> (b)  The defendant knew that a minor was consuming or in possession of an alcoholic beverage . . . at a social gathering on or within that premises, residence, or other real property.
>
> (c)  The defendant failed to take corrective action.

43

Mich. Comp. Laws § 750.141a(6).  Finally, the statute defines "corrective action" as any of the following:

> (i)  Making a prompt demand that the minor . . . depart from the premises, residence, or other real property, or refrain from the unlawful possession or consumption of the alcoholic beverage . . . on or within that premises, residence, or other real property, and taking additional action described in subparagraph (ii) or (iii) if the minor . . . does not comply with the request.

> (ii)  Making a prompt report of the unlawful possession or consumption of alcoholic liquor . . . to a law enforcement agency having jurisdiction over the violation.

> (iii)  Making a prompt report of the unlawful possession or consumption of alcoholic liquor . . . to another person having a greater degree of authority or control over the conduct of persons on or within the premises, residence, or other real property.

Mich. Comp. Laws § 750.141a(1)(e).

In this case, the parties agree that the probable cause inquiry turns upon the statutory requirement that Plaintiffs must have "knowingly allow[ed]" a minor to consume or possess an alcoholic beverage at their daughter's birthday party.  In arguing that Defendants lacked reasonable grounds for believing that this element of the charged offense had been met, Plaintiffs point primarily to (i) the evidence that they had informed several children in advance, in response to the request that the party be held in the Cheolas's home, that no alcohol was permitted at the party, (ii) the evidence of the steps taken by some of the guests at the party to bring in alcohol in a manner that would not be detected by Mr. and Mrs. Cheolas, and (iii) the lack of evidence that Mrs. Cheolas ever witnessed Phelicia VanOverbeke in an intoxicated state, or otherwise observed any

44

indicia of alcohol consumption in the basement, before she went down to the basement at just after 10:00 p.m. to determine why Phelicia had not picked up the phone call from her mother.  In light of this record, Plaintiffs maintain that any statutory obligation to take "corrective action" arose, if at all, only after Mrs. Cheolas found Phelicia and brought her upstairs, and they contend that they discharged any such obligation by tending to Phelicia and instructing their son Nicholas to go downstairs, turn up the lights, shut off the music, and investigate the situation.  (*See* N. Cheolas Dep. at 31, 41-43.)

Yet, while this certainly is one permissible view of the record, there is other evidence in the record that would support an inference that Mrs. Cheolas, at least, might have known at an earlier stage of the party that one or more children were consuming alcohol, but that she nonetheless failed to take "corrective action" within the meaning of the statute until one of the children required medical attention and the police had been called.  There is ample evidence of widespread drinking by the children at the party, with subsequent breathalyzer tests revealing that 20 of the 30 or so guests had consumed alcohol.  In addition, at least some of the children at the party have testified that it was evident, to them at least, that some of their fellow partygoers had consumed alcohol. (*See, e.g.,* Police Defendants' Motion, Ex. 24, Ochylski Dep. at 25-26; Ex. 26, K. Pickelhaupt Dep. at 23; Ex. 29, Ross Dep. at 24; Ex. 32, Schmidt Dep. at 20.) Furthermore, these and a number of other children testified that it was even more evident to them, almost immediately after Alexandra Cheolas arrived home to be surprised by her family and friends and the party had begun in earnest, that Phelicia VanOverbeke, at

45

least, had consumed alcohol and was behaving in an obviously intoxicated fashion.  (*See, e.g.,* Ex. 21, Kosorski Dep. at 20; Ex. 23, Mitchell Dep. at 19; Ochylski Dep. at 21, 36-37, 39; K. Pickelhaupt Dep. at 30-32; Ross Dep. at 24, 28; Ex. 31, Ruggeri Dep. at 18-19, 21, 27-28; Schmidt Dep. at 15, 21; Ex. 35, Sysling Dep. at 17-18, 29; Ex. 37, Tocco Dep. at 36-38.)[17]

Moreover, while Plaintiffs seek to minimize the evidence of Mrs. Cheolas's presence in the basement and lengthen the time between her last trip downstairs and her discovery that Phelicia VanOverbeke was ill, (*see, e.g.,* Plaintiff's Response Br. at 3 (identifying 9:15 pm. as "the last time Mrs. Cheolas was in the basement before finding Phelicia Van Overbeke" at around 10:00 p.m.)), Mrs. Cheolas herself has testified that she went downstairs "sporadically" during the party "[j]ust to check on things," (C. Cheolas Dep. at 154), and several of the children have testified that she made perhaps as many as five visits to the basement during the course of the party, (*see, e.g.,* K. Pickelhaupt Dep. at 27 (stating that Mrs. Cheolas came downstairs "[m]aybe like twice" to "just look[] around the basement"); Ochylski Dep. at 32 (estimating that he saw Mrs.

---

[17]Plaintiffs make much of the fact that another adult, Mary Jo Pickelhaupt, accompanied Mrs. Cheolas down to the basement to bring food to the children, and yet reported that she did not detect anything unusual or notice that any children had been drinking.  Yet, as Defendants point out, Mrs. Pickelhaupt testified (i) that she spent "[m]aybe five to ten minutes" in the basement at shortly after 9:00 p.m., (ii) that she spoke only briefly to her daughter and three other girls, and did not really observe any children other than those she spoke to, (iii) that she covered "[v]ery little" ground while in the basement, confining her visit to the area around the stairs, and (iv) that while she saw Phelicia VanOverbeke "off [in] the corner," she did not speak to the girl, was "[n]ot that close" to her, and observed her for only a "[s]econd."  (Plaintiffs' Response, Ex. 2, M. Pickelhaupt Dep. at 17-23.)

Cheolas come downstairs "about five times throughout the whole night"); Schmidt Dep.

at 27 (testifying that Mrs. Cheolas visited the basement "[m]aybe three or four" times to

"walk[] around" and talk to her daughter and "some other kids"); Sysling Dep. at 25

(stating that Mrs. Cheolas came downstairs "[a]bout three or four" times during the

party); Tocco Dep. at 25-26 (estimating that Mrs. Cheolas visited the basement "around

four or five" times between the time her daughter Alexandra arrived at the surprise party

and the time the police came)).  This testimony as to Mrs. Cheolas's periodic presence in

the basement would provide an objectively reasonable basis for the belief that she was

aware of the children's activities at the party, and hence knew that at least one of these

guests, and perhaps others, had consumed alcohol.

      Plaintiffs also downplay the testimony of the Defendant officers, who were first-

hand witnesses to the scene of the party at Plaintiff's home and whose observations

certainly are entitled to weight in a probable cause determination.  Sergeant Firlik

testified that upon entering Plaintiffs' basement, it was "very obvious drinking was going

on," and that given that Mrs. Cheolas had "told me she was going down there every 30

minutes, [she] would be hard-pressed to tell me that she did not know that there was

drinking going on in the basement."  (Firlik Dep. at 67.)  Similarly, Officer Emmendorfer

testified that he detected a strong odor of intoxicants upon entering the basement, and he,

too, stated that he found it "very hard to believe" that Mrs. Cheolas would have failed to

notice that alcohol was being consumed at the party.  (Emmendorfer Dep. at 78, 80-81.)

In addition, both Sergeant Firlik and Officer Emmendorfer cited Mrs. Cheolas's lack of

47

cooperation with the Defendant officers' efforts to investigate their concerns of underage drinking and to render aid to any children who had been drinking excessively as an indication that she was trying to hide evidence of unlawful (or at least questionable) activity in her home.  (*See* Firlik Dep. at 61-62; Emmendorfer Dep. at 83-85.)  A determination of probable cause may permissibly rest upon these sort of observations by experienced officers, as well as the conclusions they draw from the information they have learned.  *See United States v. Stotts,* 176 F.3d 880, 885 (6th Cir. 1999).

Against this evidentiary backdrop, the Court views its decision in *Watkins, supra,* as highly instructive, and not so readily distinguishable as Plaintiffs contend.  In that case, the defendant officers cited the same statute at issue here, Mich. Comp. Laws § 750.141a(2), as a basis for their determination that there was probable cause to arrest the plaintiff for knowingly allowing the use of controlled substances at a "techno" party at a hall leased by the plaintiff's production company.  There, as here, the plaintiff argued that the defendants could not "refute his claimed unawareness that minors were present and controlled substances were being used and sold on the premises."  *Watkins,* 232 F. Supp.2d at 755.  The Court disagreed, finding that there was probable cause to arrest the plaintiff for violating § 750.141a(2):

> [T]he relevant facts and circumstances presented at the time indicated:  (i) that Plaintiff exercised some degree of control over the premises . . . ; and (ii) that what appeared to be controlled substances were being openly consumed and sold on the premises, with Plaintiff seemingly able to observe this as he periodically walked among the partygoers.  Indeed, since Plaintiff was not himself a partygoer, it is difficult to conceive of any purpose in his occasional visits to the event other than to keep an eye on the

48

> proceedings and take any action he deemed necessary to preserve his
> interest in the premises.  An officer who observed Plaintiff under these
> circumstances would be justified, as a matter of law, in believing that he
> had probable cause to arrest Plaintiff for a suspected violation of Michigan
> law.

*Watkins,* 232 F. Supp.2d 756.

In so ruling, the Court observed that the plaintiff had "confuse[d] the distinct

notions of factual certainty and probable cause":

> It is not necessary that Defendants ***prove***, or even establish to some
> relatively high degree of certainty, that Plaintiff actually ***knew*** that minors
> were present at the May 6 event, or that controlled substances were being
> sold or used at the party.  If this were the rule, it would be exceedingly
> difficult for the police to establish probable cause to arrest for any offense
> that includes knowledge or intent as an element.  While a prosecutor's
> decision not to pursue charges might well turn upon the difficulty of
> proving such knowledge or intent beyond a reasonable doubt — and, for all
> we know, this might have contributed to the decision not to bring charges in
> this case — the law does not dictate this sort of calculus as a precursor to a
> lawful arrest.

*Watkins,* 232 F. Supp.2d at 755.

While the fact of the two cases are not identical, many of the circumstances that

supported a finding of probable cause in *Watkins* are also present here, at least to some

degree.  First, there is no question that Plaintiffs exercised full control over the premises.

Indeed, this control, and the attendant sense of responsibility, is undoubtedly what led

Mrs. Cheolas to take it upon herself to periodically check on the youngsters in her

basement.  Next, while the use of controlled substances in *Watkins* was more open and

obvious and had been observed by undercover officers, there nonetheless is sufficient

evidence in this case of widespread underage drinking, as well as the testimony of the

police and young partygoers that this degree of alcohol consumption either was or should have been apparent to an observer.[18]  Finally, the Court has noted the evidence that Mrs. Cheolas, like the plaintiff in *Watkins,* periodically visited her basement for the express purpose of checking in on the partygoers.

To be sure, the claim at issue in *Watkins* was false arrest, and not malicious prosecution, and the decision in that case turned in part upon a recognition that police officers must make "on the spot" assessments that might not be borne out upon further investigation.  *See Watkins,* 232 F. Supp.2d at 756.  Here, in contrast, the Harper Woods police conducted a further investigation before the decision was made to bring charges against Plaintiffs.  Yet, while this investigation turned up at least some exculpatory evidence — most notably, the statements of the children at the party as to the efforts they made to bring alcohol to the party without Plaintiffs' knowledge — the Court already has noted that some of these same children confirmed that the alcohol consumption was widespread and evident, at least to them, that one guest (Phelicia VanOverbeke) was visibly intoxicated, and that Mrs. Cheolas had made perhaps as many as five visits to the basement during the party.

Accordingly, the Court cannot say that the additional facts uncovered in the aftermath of the party vitiated any probable cause that existed as of that evening.  Rather,

---

[18]Although Plaintiffs point to the measures taken by the partygoers to conceal the alcohol they brought to the party, at least some of the children testified that no effort was made to hide themselves or their drinks from Mrs. Cheolas when she visited the basement.  (*See, e.g.,* Latcham Dep. at 31; Sysling Dep. at 26; Tocco Dep. at 25-26.)

50

these facts were mixed, with some tending to suggest that Mrs. Cheolas was unaware of

the consumption of alcohol at the party, and others supporting the inference that she knew

of this activity.[19]  As explained in *Watkins,* 232 F. Supp.2d at 755, the probable cause

standard does not require that "Defendants ***prove***, or even establish to some relatively

high degree of certainty, that Plaintiff[s] actually ***knew***" of underage drinking at their

home.  This is all the more true, as noted in *Watkins,* where the key point of dispute in the

probable cause inquiry turns upon Plaintiffs' knowledge.[20]  In light of the "difficulty of

proving such knowledge or intent," *Watkins,* 232 F. Supp.2d at 755, a prosecutor need not

insist upon direct proof of these elements of a criminal offense before deciding to bring a

charge, but is entitled to draw reasonable inferences from the totality of the evidence.  *See*

---

[19]At some point after this investigation, of course, the Defendant prosecutors elected to drop the charges against Mr. Cheolas, and Plaintiffs point to this as a concession that there was no probable cause in the first instance to bring these charges.  Even if so, however, the Court concludes that the charges against Mr. Cheolas cannot support a § 1983 claim of malicious prosecution.  First, to the extent that Plaintiffs are pursuing a malicious prosecution claim against the Defendant police officers on the theory that no charges would have been brought but for their allegedly false police reports and alleged withholding of exculpatory evidence, Plaintiffs have not identified any such falsified or withheld evidence bearing upon Mr. Cheolas's conduct on the night of the party.  Under these circumstances Plaintiffs have failed to forge the requisite causal link between any misconduct by the Defendant police officers and the bringing of charges against Mr. Cheolas.  This leaves only the Defendant prosecutors as a possible target of a claim of malicious prosecution arising from the charges against Mr. Cheolas, but the Court already has held in a separate opinion that these Defendants are entitled to absolute immunity from liability for the claims against them in this suit.  Finally, Plaintiffs have failed to suggest how Mr. Cheolas might have been injured by the fairly brief pendency of the charges against him, where it does not appear that any criminal proceedings were held during the approximately three-month period between the bringing and the dismissal of these charges, or that Mr. Cheolas otherwise was called upon to answer to these charges before they were dismissed.

[20]Notably, Mrs. Cheolas testified that she declined the invitation of the Harper Woods police to give a statement after the incident in which she could have recounted her version of the events at the party.  (*See* C. Cheolas Dep. at 238.)

51

*McCurdy v. Montgomery County,* 240 F.3d 512, 517 (6th Cir. 2001); *United States v. Lawson,* 999 F.2d 985, 987 (6th Cir. 1993). Upon considering the totality of the evidence that was uncovered on the night of the party and in the ensuing investigation, the Court finds as a matter of law that Plaintiffs' § 1983 claim of malicious prosecution arising from the charge under Mich. Comp. Laws § 750.141a(2) is defeated by the existence of probable cause to bring this charge.

The probable cause inquiry as to the next charge, contributing to the delinquency of a minor, is more straightforward. This charge rested upon a Harper Woods ordinance which makes it a misdemeanor for an individual to "by any act, or by any word, encourage, contribute toward, cause or tend to cause any minor child under the age of seventeen (17) years to become neglected or delinquent so as to come or tend to come under the jurisdiction of the juvenile division of the probate court." Harper Woods Ordinance § 14-76. As noted, a number of children at the party registered blood alcohol levels of at least 0.02, and nineteen of the partygoers were referred to the Youth Assistance Program as a result. In light of this, the same evidence that established probable cause for the charge under Mich. Comp. Laws § 750.141a(2) would readily suffice to establish probable cause to believe that Plaintiffs "contributed toward" the underage drinking at their home, and Plaintiffs make no effort to argue otherwise in their response to the Police Defendants' motion. (*See* Plaintiffs' Response Br. at 34 (relying solely on their discussion of the charge under § 750.141a(2) to assert that there was "no evidence to establish probable cause" as to the charge of contributing to the delinquency

52

of a minor).)  Consequently, the existence of probable cause defeats Plaintiffs' § 1983

claim of malicious prosecution arising from this charge.

Finally, Mrs. Cheolas was charged with violating a Harper Woods ordinance that

makes it unlawful to "resist any officer in the execution of any ordinance, by law, or any

rule, order or resolution," or to "obstruct, resist, oppose, assault, beat or wound [police

officers] in their lawful acts, attempts and efforts to maintain, preserve and keep the

peace."  Harper Woods Ordinance § 14-166.1.  In arguing that there was probable cause

for this charge, Defendants point to two decisions in which the Michigan Supreme Court

construed the essentially identical language of Mich. Comp. Laws § 750.479.  In the first

of these cases, the Michigan Supreme Court held that "actual physical interference is not

[a] necessary" element of a charge under § 750.479, nor is "an expressed threat of

physical inference" needed to sustain a charge under this statute.  *People v. Philabaun,*

461 Mich. 255, 602 N.W.2d 371, 375 (1999) (internal quotation marks and citation

omitted).  In light of this reading of the statute, the Court reinstated a charge under §

750.479 that was based upon the defendant's refusal, albeit "in a civil tone," to submit to

a blood test to determine his blood alcohol content, even when presented with a search

warrant authorizing this test.  *Philabaun,* 602 N.W.2d at 372, 376.  In so ruling, the Court

reasoned that the "defendant's conduct, although indisputably passive in nature, was

nevertheless sufficient to constitute obstruction, resistance, or opposition to the deputy's

execution of the search warrant for the extraction of defendant's blood."  602 N.W.2d at

375-76 (internal quotation marks and citation omitted).

53

In the second decision cited by Defendants, the Michigan Supreme Court addressed a case in which the defendant was charged with violating § 750.479 when he lied about his name and age in response to a police officer's efforts to ascertain whether he was an intoxicated minor. *See People v. Vasquez,* 465 Mich. 83, 631 N.W.2d 711, 714 (2001). The Court extensively discussed its prior ruling in *Philabaun,* citing it for the proposition that "[p]assive conduct, if it rises to the level of *threatened* physical interference, constitutes 'obstruction' within the meaning of the statute." *Vasquez,* 631 N.W.2d at 719-20. The Court observed that the conduct of the defendant in *Philabaun,* while passive, "rose to the level of threatened physical interference because the officers were placed in a situation in which, in order to get a sample of the defendant's blood, they would have had to physically constrain him and take his blood against his will." 631 N.W.2d at 720.

The Court then turned to another aspect of the ruling in *Philabaun:*

> We also agree with *Philabaun[]* that *actual* physical interference is unnecessary to support a charge under the "resisting and obstructing" statute. Rather, conduct that rises to the level of *threatened* physical interference is sufficient to support a charge under the statute. Additionally, we agree that an *expressed* threat of physical interference is unnecessary to support a charge under the statute. Rather, *any* conduct that rises to the level of threatened physical interference, whether it is expressed or not, is sufficient to support a charge under the statute. For example, in *Philabaun[],* the defendant's refusal to comply with the search warrant, although not an express threat of physical interference, was sufficient to support a charge under the statute because by refusing to cooperate, defendant was, in effect, physically interfering with the police officers; his refusal left the officers with no other choice than to use physical force to execute the search warrant.

54

*Vasquez,* 631 N.W.2d at 720.  Applying this reasoning to the case before it, the Court found that the charge against the defendant should be dismissed, because his act of lying to the police did not place the officer in "a situation in which his next act would, more likely than not, involve physical confrontation," nor did he "physically obstruct or resist the officer in any way."  631 N.W.2d at 720.

Returning to the present case, Sergeant Firlik has testified that Mrs. Cheolas stood in front of the door to her residence and pulled the door shut as he and the other Defendant officers attempted to enter the home to check on the condition of Phelicia VanOverbeke.  This testimony, if credited, would establish the "actual physical interference" that is sufficient, but not necessary, to sustain a "resisting and obstructing" charge.  Yet, Mrs. Cheolas has denied that she physically resisted the Defendant officers' efforts to enter her home, and instead has testified that she had reentered her house and was speaking to her husband when the officers decided to come in.  For present purposes, the Court must credit this account over the testimony of Sergeant Firlik on this point.

Nonetheless, Defendants correctly point out that Mrs. Cheolas need not have engaged in actual physical interference in order to warrant a "resisting and obstructing" charge under Michigan law.  Rather, it is enough, in Defendants' view, that Mrs. Cheolas's conduct constituted a "threatened physical interference," *Vasquez,* 631 N.W.2d at 720, such that it "left the officers with no other choice than to use physical force to open the door and proceed past her into the house to find Phelicia."  (Police Defendants' Motion, Br. in Support at 24.)  Indeed, under the present posture of this case, Defendants

55

need not *prove* that Mrs. Cheolas's conduct rose to the level of threatened physical interference, but must establish only that there was ***probable cause to believe,*** under the totality of the evidence viewed objectively, that her conduct rose to this level.

Tellingly, in their response to the Police Defendants' motion, Plaintiffs do not dispute this understanding of Michigan law, nor do they dispute that Mrs. Cheolas's resistance to the Defendant officers' efforts to enter her house, even if passive and lacking an element of actual physical interference, could provide probable cause for a charge of resisting and obstructing.  Rather, they first note Defendants' "dramatic and marked departure" from their "initial assertion that Mrs. Cheolas held the door shut," and they suggest that this establishes that the version of events recounted by Sergeant Firlik was "an utter fabrication without which there would have been no resisting and obstructing charge." (Plaintiffs' Response Br. at 34-35.)  Yet, even assuming that Sergeant Firlik's testimony on this point is inaccurate or flat-out false, the question presently before this Court is whether the record, construed in a light most favorable to Plaintiffs but viewed objectively, would support a finding of probable cause, and the motives of the Defendant officers or any intent to obfuscate are entirely immaterial to this inquiry.  *See Watkins,* 232 F. Supp.2d at 754-55.  Thus, Defendants' changing "spin" of the record is irrelevant, as are any purported "fabrications" within this record, because Plaintiffs are entitled to a view of the record that is most favorable to them as the Court resolves Defendants' summary judgment motions.

Plaintiffs next contend that Defendants "cannot premise a 'resisting and

56

obstructing' charge on refusal to consent to a warrantless, illegal search." (Plaintiffs' Response Br. at 35.) The Court having ruled as a matter of law that the Defendant officers were legally authorized to enter Plaintiffs' home without a warrant, this challenge to the "resisting and obstructing" charge cannot succeed.

This leaves only Plaintiffs' appeal to the evidence which, in their view, establishes that Mrs. Cheolas "had been given the impression that her permission was needed" for the Defendant officers to enter her home. (*Id.* at 35-36.) Although Plaintiffs' argument on this point is not altogether clear, they evidently surmise that Mrs. Cheolas could not have been "resisting" the Defendant officers if she was under the impression that the officers, rather than insisting on a legal right to enter the home, were instead awaiting her decision whether to allow them into her home. Yet, even assuming that this is a permissible inference to be drawn from the record,[21] it certainly is not the only permissible inference. Rather, the record would also permit the inference that the Defendant officers stated their intention to enter Plaintiffs' home, and that Mrs. Cheolas responded with conduct that, viewed objectively, could be deemed to constitute threatened physical interference with the officers' lawful attempt to enter her home. This suffices to provide probable cause for

---

[21]The transcript of the Defendant officers' interaction with Mrs. Cheolas outside the home does not seem to bear this out. She asked the officers at two different points whether "you need to go in" and whether there was "a reason you need to come in," and the officers answered each of these inquiries in the affirmative. (Police Defendants' Motion, Ex. 2, Videotape Tr. at 3.) Then, once the officers decided to enter the house, one of them instructed Mrs. Cheolas to "[s]tep aside" and she responded "no." (*Id.* at 5.) This does not suggest that the officers were merely awaiting Mrs. Cheolas's decision whether to allow them into her house.

charging Mrs. Cheolas with resisting and obstructing.[22]

Finally, apart from the question of probable cause, Plaintiffs contend more generally that their efforts to develop an evidentiary record in support of their § 1983 claims of malicious prosecution (as well as their employment discrimination claims, addressed below) were hindered by their inability to take the depositions of Defendants Leidlein, Sheill, LaBarge, and DeWaele. Yet, Plaintiffs have failed to show that these depositions are needed in order to "present facts essential to justify [their] opposition" to Defendants' motions, as required to secure a continuance under Fed. R. Civ. P. 56(f). Nor can they make such a showing, where any testimony by these Defendants as to the motives for their actions and decisions cannot possibly have any bearing upon the objective inquiry whether the facts known to Defendants were sufficient to provide probable cause to charge Plaintiffs with the three above-cited offenses. These underlying facts are well known to all in this case, and there has been ample opportunity to develop this record through discovery in this case and in the state court criminal proceedings.[23]

Moreover, Plaintiffs failed to act expeditiously during the ample discovery period

---

[22]Once again, in light of the Court's determination that Plaintiffs have failed to establish the "lack of probable cause" element of their § 1983 claims of malicious prosecution, there is no need to address the individual Defendants' appeal in the alternative to the doctrine of qualified immunity. In addition, Plaintiffs' § 1983 claims against the Defendant City, as well as their federal claims of conspiracy to violate their civil rights, fail for lack of an underlying constitutional violation.

[23]The Court made a similar point in denying Plaintiffs' earlier motion for a Rule 56(f) continuance in connection with their response to the motion to dismiss filed by Defendants LaBarge and DeWaele on grounds of absolute prosecutorial immunity.

in this case to secure the deposition testimony of two of these parties, Defendants

Leidlein and Sheill.  Although Plaintiffs filed a motion to compel these depositions, this

motion was resolved through a December 22, 2006 order in which the Magistrate Judge

indicated that "[t]he parties are continuing to work on scheduling the Defendants'

depositions."  (12/22/2006 Order at 2.)  The Magistrate Judge further stated in this order

that "Plaintiffs are instructed to contact my deputy clerk to arrange for a follow-up

hearing if sufficient progress in scheduling the depositions has not been made by January

8, 2007."  (*Id.*)  Nothing in the record indicates that Plaintiffs sought any such follow-up

hearing, or that they otherwise revisited this issue until they filed a motion for a Rule

56(f) continuance in connection with their responses to Defendants' summary judgment

motions.  Under these circumstances, Plaintiffs forfeited any possible complaints about

their inability to take these depositions by failing to seek appropriate and timely relief

during the discovery period.[24]

### E.     Plaintiffs Have Failed to Produce Evidence that the Defendant City's Stated Reason for Terminating Mrs. Cheolas's Employment Was a Pretext for Unlawful Gender or Age Discrimination.

The final federal claims asserted in Plaintiffs' complaint arise from the Defendant

City's termination of Mrs. Cheolas's employment.  Apart from challenging this discharge

on state-law grounds, Mrs. Cheolas asserts that the City's decision to terminate her

---

[24]While Plaintiffs did act to preserve their objection that they were being denied the opportunity to take the depositions of Defendants LaBarge and DeWaele, the Court explained in an earlier ruling (noted above) that these depositions would not assist in Plaintiffs' effort to overcome these Defendants' entitlement to absolute prosecutorial immunity.

employment was the product of unlawful discrimination on account of her gender and/or age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and/or the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  In seeking summary judgment in their favor on these claims, Defendants argue that Plaintiffs have failed to produce evidence that the City's stated reason for Mrs. Cheolas's discharge — namely, her hosting of a party at her home where a significant number of children were found to have consumed alcohol — was a pretext for discrimination on the basis of gender or age.  The Court agrees.

Plaintiffs do not claim to have uncovered any direct evidence of gender or age discrimination.  Accordingly, their Title VII and ADEA claims are governed by the familiar tripartite approach adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  *See White v. Columbus Metropolitan Housing Authority,* 429 F.3d 232, 238 (6th Cir. 2005) (Title VII claim); *Hedrick v. Western Reserve Care System,* 355 F.3d 444, 459 (6th Cir. 2004) (ADEA claim).  In this case, Mrs. Cheolas was over the age of 40 at the time her employment was terminated, and she was replaced by a younger male.  Thus, the City concedes, at least for present purposes, that she has established a *prima facie* case of age and gender discrimination.  In addition, the parties agree that the Defendant City has articulated a legitimate, non-discriminatory ground for its decision to terminate Mrs. Cheolas's employment — as stated in Defendant James Leidlein's July 18, 2005 letter informing Mrs. Cheolas of this decision, her discharge was based upon her "actions on the night of

April 24, 2004 when you had a large party at your residence where a significant number

of juveniles were consuming alcohol."  (City's Motion, Ex. 4.)

Accordingly, Plaintiffs must point to evidence in the record from which a trier of

fact could reasonably conclude that the City's stated basis for its decision is a mere

pretext for unlawful age or gender discrimination.  *See White,* 429 F.3d at 245; *Hedrick,*

355 F.3d at 460.  "A plaintiff can refute the legitimate, nondiscriminatory reason

articulated by an employer to justify an adverse employment action by showing that the

proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's

challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Johnson*

*v. Kroger Co.,* 319 F.3d 858, 866 (6th Cir. 2003) (internal quotation marks and citation

omitted).  Yet, "establishing that the employer's reason was a pretext requires that a

plaintiff do more than simply impugn the legitimacy of the asserted justification; in

addition, the plaintiff must also adduce evidence of the employer's discriminatory

animus."  *Pierce v. Commonwealth Life Insurance Co.,* 40 F.3d 796, 804 (6th Cir. 1994).

"[A] reason cannot be proved to be 'a pretext *for discrimination'* unless it is shown *both*

that the reason was false, *and* that discrimination was the real reason."  *St. Mary's Honor*

*Center v. Hicks,* 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993).

Plaintiffs' attempts to make this showing are insufficient as a matter of law.  First,

Plaintiffs seek to challenge the factual basis for the City's decision to discharge Mrs.

Cheolas by arguing that the events on the night of the party at their home did not happen

as the police reports depicted them.  Yet, even assuming that there were inaccuracies in

61

the factual accounts relied upon by the decisionmaker, Defendant Leidlein, the Sixth

Circuit has explained that "as long as an employer has an honest belief in its proffered

nondiscriminatory reason for discharging an employee, the employee cannot establish that

the reason was pretextual simply because it is ultimately shown to be incorrect."

*Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001).

There is no evidence to suggest that Leidlein did not honestly believe in the version of

events laid out in his correspondence with Mrs. Cheolas, even after he gave her an

opportunity to rebut this version.  More importantly, Plaintiffs' factual challenges to the

police reports do not meaningfully detract from the key points identified in Leidlein's

letter informing Mrs. Cheolas of her discharge:  (i) that she had hosted "a large party at

your residence where a significant number of juveniles were consuming alcohol," and (ii)

that, in Leidlein's view, Mrs. Cheolas did not respond in an appropriately cooperative

fashion when "police and emergency medical personnel . . . were summoned to your

home to give assistance to a child in need of medical attention."  (City's Motion, Ex. 4.)

Indeed, as to this latter point, Mrs. Cheolas acknowledged in an earlier letter to Leidlein

that she opposed any police or EMS intervention or involvement on the night of the party,

explaining that she was "under no duty to invite police officers or EMS into my home

without proper warrants or other authorizations."  (City's Motion, Ex. 2, C. Cheolas

Letter at 3.)  While Mrs. Cheolas certainly was entitled to adopt this legal position, this

does nothing to detract from the factual basis for Leidlein's conclusion that she failed to

cooperate with fellow City employees who were seeking to provide medical assistance to

62

a child at her home.

Next, Plaintiffs suggest that the City and Leidlein offered inconsistent explanations for taking adverse employment actions against Mrs. Cheolas. *See Cicero v. Borg-Warner Automotive, Inc.,* 280 F.3d 579, 592 (6th Cir. 2002) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext." (internal quotation marks and citations omitted)). In particular, Plaintiffs point to Leidlein's June 9, 2004 letter in which he advised Mrs. Cheolas that she was being suspended without pay until the criminal charges against her were "adjudicated or otherwise resolved," (City's Motion, Ex. 3), whereas Leidlein then terminated Mrs. Cheolas's employment on July 18, 2005 while these charges were still pending. The Court fails to see, however, how these two explanations differ in any material respect. While Leidlein's June 9, 2004 letter does link Mrs. Cheolas's suspension to the pendency of the criminal charges against her, this letter further states that he did not "find your response to be persuasive in changing the conclusions of my May 17, 2004 memorandum," (City's Motion, Ex. 3), in which he had laid out his concerns about the events at Plaintiffs' home on April 24, 2004 and Mrs. Cheolas's conduct that evening, (*see* City's Motion, Ex. 1). It is clear from this record, then, that Leidlein's decisions were consistently based on his disapproval of Mrs. Cheolas's role in the events of April 24, 2004.

Finally, and most importantly, even assuming that Plaintiffs were able to point to evidence that might tend to refute or cast some degree of doubt upon the reason given by the City for terminating Mrs. Cheolas's employment, there is no evidence that this stated

63

reason was a pretext **for discrimination**.  Simply stated, nowhere in Mrs. Cheolas's

deposition, nor elsewhere in the voluminous record, is there a shred of evidence that Mrs.

Cheolas's superiors were motivated by age- or gender-based animus.  Rather, the entire

tenor of Plaintiffs' allegations in this case is that Defendants brought charges against

Plaintiffs and terminated Mrs. Cheolas's employment based on their disapproval of, if not

outright hostility toward, Plaintiffs' conduct on the night of April 24, 2004.  Whatever

one might say about which side's assessment of this incident is correct or which side's

version of the relevant facts or law is more accurate or persuasive, there is nothing

whatsoever in the record to suggest that any Defendant — much less the relevant

decisionmaker as to Plaintiffs' Title VII and ADEA claims, Defendant Leidlein — acted

or drew any conclusions on the basis of Mrs. Cheolas's age or gender.  Under this record,

Plaintiffs cannot show that the reason given by Leidlein for terminating Mrs. Cheolas's

employment was a pretext for unlawful discrimination.[25]

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Police Defendants'

motion for summary judgment (docket #98) is GRANTED IN PART, as to Plaintiffs'

federal claims, and is otherwise DENIED AS MOOT.  IT IS FURTHER ORDERED that

---

[25]As a result of the rulings in this opinion and order, all of the federal claims asserted in
Plaintiffs' complaint have now been resolved prior to trial.  Under these circumstances, the Court
declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims, but
instead will dismiss these claims without prejudice.  *See* 28 U.S.C. § 1367(c)(3); *Hankins v.
Gap, Inc.,* 84 F.3d 797, 802-03 (6th Cir. 1996).

the motion for summary judgment filed by Defendants City of Harper Woods, the Harper Woods Police Department, and James E. Leidlein (docket #95) is GRANTED IN PART, as to Plaintiffs' federal claims, and is otherwise DENIED AS MOOT.  Finally, IT IS FURTHER ORDERED that Plaintiffs' motion for a continuance pending further discovery (docket #124) is DENIED.  In light of these rulings, the remaining pending motions in this case (docket #s 93, 97, 107, and 141) are DENIED AS MOOT.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  September 29, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 29, 2009, by electronic and/or ordinary mail.

s/Ruth Brissaud
Case Manager